1
2
3
4
5
6                    UNITED STATES DISTRICT COURT
7                         DISTRICT OF NEVADA
8                                          * * *
9   GREGORY KELLY,                    )
                                      )
10              Plaintiff,            )
                                      )          2:12-cv-02074-LRH-CWH
11  v.                                )
                                      )
12  LAS VEGAS METROPOLITAN POLICE     )          ORDER
    DEPARTMENT, *et al.*,             )
13                                    )
                Defendants.           )
14  _____  )

15          Before the Court is Defendant Las Vegas Metropolitan Police Department's ("LVMPD")

16  Motion for Summary Judgment.  Doc. #136.[1]  Plaintiff Gregory Kelly ("Kelly") filed a Response

17  (Doc. #145), to which LVMPD replied (Doc. #153).

18          Also before the Court is Defendants William F. Catricala ("Caltricala"), Christopher Garcia

19  ("Garcia"), and John Campbell's ("Campbell") (collectively "Defendants") Motion for Summary

20  Judgment.  Doc. #137.  Kelly filed a Response (Doc. #146), to which Defendants replied (Doc.

21  #152).  Kelly also filed a Motion for Leave to File a Sur-Reply to Defendants' Motion.  Doc. #158.

22  Defendants filed a Response (Doc. #161), to which Kelly did not reply.

23  **I.      Facts and Procedural History**

24          At 6:30 a.m., on December 5, 2010, LVMPD received a call from Lisa Alexander

25  ("Alexander"), Kelly's girlfriend at the time, reporting a domestic disturbance.  Doc. #136, Ex. D.

26
            _____
            [1] Refers to the Court's docket number.

In response to the 9-1-1 operator's inquiry, Alexander reported that no one had been hit or pushed yet. *Id.*  Kelly can be heard in the background saying "no one's been hit, there's been no violence." *Id.*  Alexander responded, "you just broke down my door." *Id.*  Alexander informed the 9-1-1 operator that Kelly had been drinking. *Id.*  Alexander also informed the 9-1-1 operator that Kelly was a bounty hunter and had a hand gun in the master bedroom closet. *Id.*

Thereafter, dispatch radioed that there was a 417 (domestic disturbance), that Kelly was a bounty hunter and had a 413 (handgun) in the master bedroom closet, and that 408 (alcohol) was involved.  Doc. #136, Ex. D.  After placing the call to 9-1-1, Alexander went outside to the front of the residence to wait for the officers.  Doc. #136, Ex. B, ¶28.  Kelly remained inside the residence. Doc. #145, Ex. 5.  Officers Ivens Munoz ("Munoz"), Thomas Carrigy ("Carrigy"), Garcia, Campbell, and Catricala responded to the dispatch.[2]  Catricala, Campbell, and Garcia approached the front door to the residence, while Munoz and Carrigy stayed with Alexander.  Doc. #136, Ex. G, ¶13.  At that time, Alexander informed Munoz that "at no point did the argument become physical."  Doc. #145, Ex. 5.  At the front door, Catricala knocked several times and announced LVMPD presence.  Doc. #136, Ex. G, ¶15.  After several minutes, Kelly opened the door.[3] Defendants claim that Kelly was concealing part of his body behind the door with one hand in his pocket.  Doc. #136, Ex. G, ¶22; Doc. #136, Ex. H, ¶15; Doc. #136, Ex. I, ¶16; Doc. #145, Ex. 12, 4:24-27.  Kelly denies that he was concealing part of his body behind the door.  Doc. #145, 10:3-7.

At some point shortly after Kelly opened the door, Clifford[4] began barking and ran out of the residence toward Defendants.  Doc. #136, Ex. G, ¶19; Doc. #136, Ex. H, ¶17; Doc. #136, Ex.

---

[2]  Evidently there was some mix up with the address provided by Alexander to the 9-1-1 operator.

[3]  Kelly does not dispute Catricala's recollection that he did not answer the door for several minutes.  Kelly testified that he was attempting to put his dog, Clifford, away in the kitchen.  Doc. #136, Ex. A, 81:6-11.  Kelly is approximately 6' 3" tall and, at the time of the incident, weighed approximately 230 pounds.

[4]  Defendants estimate Clifford to be approximately 90 pounds.  Doc. #136, p. 7 n.7; Doc. #136, Ex. G, ¶19.  Kelly estimates Clifford to be approximately 70 pounds.  Doc. #145, 4:18.

A, 81:15-22.  Defendants drew their weapons at Clifford and told Kelly to get control of his dog or else they would shoot him.[5]  Doc. #136, Ex. G, ¶20; Doc. #136, Ex. H, ¶18; Doc. #145, Ex. 12, 4:28-31.  Clifford then returned back to the inside of the residence.  The parties dispute whether Kelly was holding Clifford at the threshold of the residence.  Defendants assert that Clifford went back into the residence on his own and Kelly stood at the threshold with one hand still in his pocket.  Doc. #136, Ex. G, ¶¶21, 24; Doc. #136, Ex. H, ¶19; Doc. #145, Ex. 12, 4:33-35.  Kelly asserts that he was holding Clifford with one hand at the doorway.  Doc. #136, Ex. A, 82:3.  Defendants then ordered Kelly to show both of his hands and come outside to speak to them.  Doc. #136, Ex. G, ¶¶22, 24; Doc. #136, Ex. H, ¶¶19, 20; Doc. #136, Ex. A, 81:23-82:4.  Kelly refused and instead invited Defendants into his residence to speak with him there.[6]  Doc. #136, Ex. G, ¶¶22, 24; Doc. #136, Ex. H, ¶20; Doc. #136, Ex. A, 81:23-82:4.  Kelly was showing Defendants only one hand at a time.[7]  Doc. #136, Ex. G, ¶24; Doc. #136, Ex. H, ¶¶19, 20; Doc. #136, Ex. A, 81:25-82:4.  Again, Defendants ordered Kelly to show both of his hands and come outside to speak with them.  Doc. #136, Ex. G, ¶24; Doc. #136, Ex. H, ¶¶21, 22; Doc. #136, Ex. A, 81:25-82:4.  Again, Kelly refused Defendants' order to come outside and requested that they come inside his residence.  Doc. #136, Ex. G, ¶26; Doc. #136, Ex. H, ¶23.  Kelly continued to show only one hand at a time to Defendants.[8]  Doc. #136, Ex. A, 82:4.

---

[5]  Defendants assert, and Kelly denies, that Clifford was being aggressive at the time.  Kelly does not dispute that Clifford was barking at the time.

[6]  Catricala claims that he felt it was necessary to conduct the investigation outside so that the dog could be quarantined inside of the residence and would not pose a threat to any of the officers.  Doc. #135, Ex. G, ¶22.  Moreover, Garcia stated that Defendants did not want to go inside the residence because of the dog and the potential presence of a gun.  Doc. #145, Ex. 12, 4:38-39.

[7]  Kelly claims that his hands were not in his pockets, but he was holding Clifford with one hand and switching hands.  Doc. #136, Ex. A, 81:23-82:9.  He further asserts that Catricala's commands to show both of his hands and control his dog were conflicting.  Doc. #145, 10:19-22.

[8]  Catricala testified that Kelly was intoxicated and his demeanor was "aggressive and uncooperative."  Doc. #136, Ex. G, ¶23.  Garcia testified that Kelly appeared to be intoxicated.  Doc. #136, Ex. H, ¶29.  Campbell also testified that Kelly appeared to be intoxicated and smelled strongly

1   Defendants claim that Kelly began to retreat into the residence, at which point Catricala

2   decided to arrest him.  Doc. #136, Ex. G, ¶26; Doc. #136, Ex. H, ¶23; Doc. #145, Ex. 12, 4:42.

3   Kelly denies that he was retreating anywhere.  Doc. #145, 10:26.  Defendants admit that Catricala

4   and Campbell stepped into the threshold of Kelly's residence and grabbed each of his arms.[9]  Doc.

5   #136, Ex. G, ¶27; Doc. #136, Ex. I, ¶23.  Catricala and Campbell put Kelly in a "double-arm bar,"

6   took him down to the ground, and placed him in handcuffs.  Doc. #136, Ex. G, ¶¶27, 28; Doc.

7   #136, Ex. I, ¶¶23-25.  Garcia then entered the residence to keep Clifford away from Catricala and

8   Campbell.  Doc. #136, Ex. H, ¶26; Doc. #145, Ex. 12, 5:3-8.  Catricala and Campbell assisted

9   Kelly to his feet and then Catricala and Carrigy escorted him to the patrol car.[10]  Doc. #136, Ex. G,

10   ¶¶29, 30; Doc. #136, Ex. I, ¶¶26, 28; Doc. #136, Ex. C, 8:23-28.  Thereafter, officer Beau Hunn

11   ("Hunn") arrived to transport Kelly to the Clark County Detention Center ("CCDC").  Doc. #136,

12   Ex. G, ¶36; Doc. #136, Ex. I, ¶34.

13   Kelly claims to have suffered a torn rectus femoris (quadricep tendon rupture) in his left leg

14   and a torn rotator cuff in his left shoulder as a result of the incident.  Doc. #136, Ex. C, 12:6-8.

15   Kelly asserts that he had no injury of this nature to his left shoulder or left knee prior to the incident

16   in question.[11]  Doc. #136, Ex. C, 9:20-21.  On December 5, 2012, exactly two years after the

17   alleged incident took place, Kelly filed a Complaint.  *See* Doc. #1.  On August 1, 2013, Kelly filed

18

19   of alcohol.  Doc. #136, Ex. I, ¶27.  Kelly denies that he was intoxicated, but admits to having

20   consumed alcohol that evening.  Doc. #145, Ex. 17, 7:34-36.

21   [9] Catricala estimated that he was approximately 6 feet into the residence.  Doc. #145, Ex. 6,
     8:28-30.

22

23   [10] Defendants contend that Kelly could walk to the car on his own (Doc. #136, Ex. G, ¶30;
     Doc. #136, Ex. I, ¶29), while Kelly asserts that Catricala and Campbell had to support his weight due

24   to the injuries he sustained (Doc. #145, 7:14-16).

25   [11] Kelly admits to having sprained his knee during a judo throw in the Bail Enforcement
     Academy in August of 2010.  Doc. #136, Ex. C, 13:12-16.  He claims that the injury was immediately

26   examined by David Conger, an Emergency Medical Technician, who determined that there were no
     tears at the time.  *Id.*

a Second Amended Complaint, alleging claims for unlawful entry, unlawful arrest, excessive force, due process violations, civil conspiracy, deliberate indifference to a serious medical need, municipal liability, assault and battery, and negligence.  Doc. #67.  On December 27, 2013, the Court issued an Order dismissing with prejudice Kelly's fourth, fifth, and sixth causes of action.  Doc. #124.  The Court also dismissed with prejudice all of the individually named Defendants in Kelly's ninth cause of action.  *Id.*  Accordingly, the following claims remain: (1) unlawful entry against Catricala, Campbell, and Garcia; (2) unlawful arrest against Catricala; (3) excessive force against Catricala and Cambpell; (7) municipal liability against the LVMPD; and (9) negligence against the LVMPD.

## II.    Legal Standard

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, affidavits or declarations, stipulations, admissions, and other materials in the record show that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the initial burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party."  *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).  On an issue as to which the non-moving party has the burden of proof, however, the moving party can prevail merely by demonstrating that there is an absence of evidence to support an essential

1   element of the non-moving party's case.  *Celotex*, 477 U.S. at 323.

2       To successfully rebut a motion for summary judgment, the non-moving party must point to

3   facts supported by the record which demonstrate a genuine issue of material fact.  *Reese v.*

4   *Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000).  A "material fact" is a fact "that might

5   affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

6   242, 248 (1986).  Where reasonable minds could differ on the material facts at issue, summary

7   judgment is not appropriate.  *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983).  A dispute

8   regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could

9   return a verdict for the nonmoving party."  *Liberty Lobby*, 477 U.S. at 248.  The mere existence of a

10  scintilla of evidence in support of the party's position is insufficient to establish a genuine dispute;

11  there must be evidence on which a jury could reasonably find for the party.  *See id.* at 252.

12  **III.   Discussion**

13      **A.      First Cause of Action—Unlawful, Warrantless Entry in Violation of**
            **42 U.S.C. § 1983 (Catricala, Campbell, and Garcia)**
14

15      "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home

16  without a warrant are presumptively unreasonable."  *Payton v. New York*, 445 U.S. 573, 586

17  (1980).  The presumption of unconstitutionality that accompanies "the [warrantless] entry into a

18  home to conduct a search or make an arrest" may be overcome only by showing "consent or exigent

19  circumstances."  *Lopez-Rodriguez v. Mukasey*, 563 F.3d 1012, 1016 (9th Cir. 2008) (quoting

20  *Steagald v. United States*, 451 U.S. 204, 211 (1981)); *see also Payton*, 445 U.S. at 590; *United*

21  *States v. Prescott*, 581 F.2d 1343, 1350 (9th Cir. 1978) ("absent exigent circumstances, police who

22  have probable cause to arrest a felony suspect must obtain a warrant before entering a dwelling to

23  carry out the arrest"); *Espinosa v. City and Cnty. of San Francisco*, 598 F.3d 528, 533 (9th Cir.

24  2010) (consent is an exception to the Fourth Amendment's warrant requirement).  Here,

25  Defendants assert that they are entitled to summary judgment on Kelly's claim for unlawful,

26  warrantless entry on three bases: (1) Kelly consented to Defendants' entry into his residence; (2) the

entry was lawful due to exigent circumstances; and (3) Defendants are entitled to qualified immunity.  Kelly disputes the same.

"[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." *Florida v. Royer*, 460 U.S. 491, 497 (1983).  Here, the Court finds Kelly's consent to enter his residence was as freely and voluntarily given as it was unequivocal.  It is undisputed that Kelly voluntarily opened the door and invited Defendants into his home at least twice.  *See* Doc. #67 (Am. Compl.), ¶27 ("Plaintiff voluntarily opened the door and invited the officers to enter."), ¶28 ("Plaintiff refused [to come out], but again extended the invitation for them to enter."); *see also* Doc. #136, Ex. A (Kelly Depos.), 84:5-8 ("Yes [I was aware that Defendants were there to conduct an investigation].  And they were fully invited to come in and conduct their investigation, and they refused."); Doc. #136, Ex. C (Kelly's Answers to LVMPD's First Set of Interogs.), #5 ("Upon opening the door voluntarily, while attending to Clifford, Plaintiff said 'Come on in guys.'" . . . "Plaintiff refused [to come out], but again extended the invitation to them to enter.").

Moreover, there is nothing in the record to indicate that threats or force were used to get Kelly to open the door.  *See Payton*, 445 U.S. at 576-77 (warrantless arrest of suspect in his home violated the Fourth Amendment where police broke through a closed door with crowbars).  Nor is there any indication that Defendants used a subterfuge or other coercive tactics in order to get Kelly to open the door.  *See United States v. Johnson*, 626 F.2d 753, 757 (9th Cir. 1980) (warrantless arrest of suspect in doorway within his home was improper because of the deceitful manner in which the officers caused the door to be opened).  Instead, Kelly voluntarily opened the door and further invited Defendants into his home.  In *United States v. Vaneaton*, 49 F.3d 1423, 1426-27 (9th Cir. 1995), the Ninth Circuit determined that the defendant had voluntarily exposed himself to warrantless arrest when he voluntarily opened the door to officers thereby exposing himself and the immediate area to them.  Here too, the Court finds that Kelly's arrest was proper as he voluntarily

exposed himself and his home to Defendants.  By implicitly and explicitly consenting to Defendants' presence in his home, Kelly had no reasonable expectation of privacy.  *See United States v. Garcia*, 997 F.2d 1273, 1280-81 (9th Cir. 1993) (finding defendant's warrantless arrest was not improper where he impliedly consented to entry by stating "okay," nodding, and stepping back, in response to officer's request to talk to him); *see also United States v. Santana*, 427 U.S. 38 (1976) (finding that once defendant was exposed to public view in her doorway, her act of retreating into her house could not thwart an otherwise proper arrest by officers who pursued her inside).

Kelly's assertion that his invitation to Defendants was only for purposes of their investigation and that he did not consent to "a forceful entry, *without notice*, . . . [or] to being slammed to the ground, severely injured, handcuffed, and arrested" is unsustainable.  First, Kelly's voluntary act of opening the door belies any insinuation that Defendants' entry was forceful.  Second, the Ninth Circuit has held that "an entry through an open door without force does not constitute a 'breaking' and thus does not require the officers to announce for the purpose of their presence."  *United States v. Scharf*, 421 F.2d 1239, 1240 (9th Cir. 1970) (citing *Dickey v. United States*, 332 F.2d 773, 778 (9th Cir. 1964), cert. denied, 379 U.S. 948 (1964)).  Accordingly, Defendants were not required to give notice or obtain separate consent to enter for the purpose of arresting him.

Because Defendants had consent to enter Kelly's home, the Court concludes that Defendants' warrantless entry six feet into Kelly's doorway did not run afoul of the Fourth Amendment.  For this reason as well, the Court finds that Defendants are entitled to qualified immunity.  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity shields public officials from money damages unless a plaintiff pleads facts showing (1) that the official

violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2080 (2011) (citing *Harlow*, 457 U.S. at 818); *see also Pearson*, 555 U.S. at 236 (finding that lower courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first). Here, because Defendants did not violate Kelly's Fourth Amendment rights when they effected a warrantless entry into his home for purposes of arrest, they are entitled to qualified immunity. Moreover, in light of existing precedent as to consent, the Court cannot conclude that the law is so well-established that every reasonable officer in these circumstances would have understood that the conduct at issue was a violation of the Fourth Amendment. Accordingly, summary judgment is granted in favor of Defendants on Kelly's first claim for unlawful entry.[12]

---

[12] While the Court need not reach the issue of exigent circumstances, the Court nevertheless finds that no exigency existed to justify Defendants' warrantless entry. The Ninth Circuit "defines exigent circumstances as those circumstances that would cause a reasonable person to believe that entry . . . was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005) (citing *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir. 1984) (en banc) (abrogated on other grounds). The Ninth Circuit has previously delineated the circumstances under which the exigency exception may apply: "(1) the need to prevent physical harm to the officers or other persons, (2) the need to prevent the imminent destruction of relevant evidence, (3) the hot pursuit of a fleeing suspect, and (4) the need to prevent the escape of a suspect." *United States v. Struckman*, 604 F.3d 731, 743 (9th Cir. 2010). In *Martinez*, the Ninth Circuit found that the exigency doctrine was inapplicable in a domestic violence situation because the victim had already left the premises. *Id.* Here too, Defendants were aware that Alexander had left the home. Accordingly, the only basis on which Defendants may arguably assert the existence of an exigency is the need to prevent physical harm to themselves.

Although Defendants knew that Kelly had a gun in the house, there is no indication that he ever used or threatened to use it. *See Fisher v. City of San Jose*, 558 F.3d 1069, 1075 (9th Cir. 2009) (finding exigency where suspect was pointing his gun at an officer and threatened to shoot the officer if she approached his apartment). Moreover, while Defendants knew that Kelly was a bounty hunter and were informed that Kelly had "kicked a door in," there is little indication that Kelly himself was behaving in a violent or volatile manner towards Defendants. *See id.* (finding exigency where suspect was obviously intoxicated and his behavior and irrational statements gave police cause for concern that he might be mentally unbalanced and unpredictable). Accordingly, the Court finds that no exigent circumstances justified Defendants' warrantless entry.

**B.**   **Second Cause of Action—Unlawful Arrest and Detention Without Probable Cause in Violation of 42 U.S.C. §1983 (Catricala)**

"There is probable cause for a warrantless arrest . . . if, under the totality of the facts and circumstances known to the arresting officer, a prudent person would have concluded that there was a fair probability that the suspect had committed a crime." *Struckman*, 603 F.3d at 739 (quoting *United States v. Gonzales*, 749 F.2d 1329, 1337 (9th Cir. 1984)) (internal quotation marks omitted); *see also United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) ("[p]robable cause to arrest exists then officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested"). "Probable cause demands factual specificity and must be judged according to an objective standard." *Id.* (internal citations and quotation marks omitted).

Nevada Revised Statutes ("NRS") 197.190 provides that:

> Every person who, after due notice, . . . shall willfully hinder, delay or obstruct any public officer in the discharge of official powers or duties, shall, where no other provision of law applies, be guilty of a misdemeanor.

Here, the undisputed facts demonstrate that Kelly was given several opportunities to comply with Defendants' orders to come out of the residence and show both of his hands, but failed to do so. Doc. #136, Ex. G (Catricala Affidavit), ¶¶21, 22, 24 (testifying that Kelly said "no" when ordered to come outside and speak with the officers and that Kelly refused three orders to show both of his hands); Doc. #136, Ex. H (Garcia Affidavit), ¶¶ 19-23 (testifying that twice Kelly refused Catricala's orders to come outside and show both of his hands); Doc. #136, Ex. I (Campbell Affidavit), ¶¶16-22 (testifying that Kelly refused multiple orders from Catricala to come outside

---

Similarly, although the Defendants do not invoke it, the emergency exception to the warrant requirement does not apply as Defendants' entry was primarily motivated by an intent to arrest. *See id.* (warrantless entry must not be primarily motivated by intent to arrest and seize evidence in order for emergency exception to the warrant requirement to apply). Here, Defendants do not assert that their primary motivation was to secure Kelly's weapon, thereby preventing harm to themselves or others. Rather, Defendants admit that their primary motivation was to arrest Kelly.

and take his other hand out of his pocket).  Kelly admits that when Defendants directed him to come out of his residence, he refused.  Doc. #67, ¶28; Doc. #136, Ex. C, 7:5.  Kelly further admits that when ordered to show both of his hands, he only showed one hand at a time.[13]  Doc. #67,  ¶29; Doc. #136, Ex. C, 7:8-9.

Contrary to Kelly's apparent assertion, it was not for Defendants to accede to his offer that they come inside his residence to conduct their investigation.  Rather, it was incumbent upon Kelly to comply with Defendants orders—whatever their reasoning.[14]  Nor were Catricala's orders conflicting as Kelly suggests—Kelly could have restrained Clifford in his residence, come outside to speak with Defendants, and shown both of this hands as ordered by the officers.  Finally, Kelly's suggestion that he did not receive notice in accordance with the statute is belied by the undisputed facts set forth above.  Catricala made clear and repeated orders to come outside and to show both of his hands.  Kelly himself admits to having been on notice of the same.  Thus, the Court finds that, by refusing Catricala's orders, Kelly obstructed Defendants' lawful investigation into the domestic disturbance for which they had been dispatched.  Accordingly, the Court finds that Catricala had probable cause to arrest Kelly for "willfully hinder[ing], delay[ing] or obstruct[ing] any public officer in the discharge of official powers or duties" in violation of NRS 197.190.  Because Catricala had probable cause to arrest Kelly for violation of NRS 197.190, he is also entitled to qualified immunity.  Moreover, the Court cannot conclude that the law is so well-established that every reasonable officer in these circumstances would have understood that there was no probable

---

[13]  Defendants testified that Kelly's hands were in his pockets at the time.  Doc. #136, Ex. G, ¶24; Doc. #136, Ex. H, ¶¶19, 21; Doc. #136, Ex. I, ¶¶16, 19.  Kelly testified that "[w]hile holding Clifford with one hand, he showed, one hand, then the other."  Doc. #136, Ex. C, 7:9.  Nevertheless, any discrepancy in what Kelly was doing with his other hand is immaterial at this juncture.  The fact remains that Kelly did not comply with Catricala's orders to show both of his hands.

[14]  While immaterial to the Court's determination, Catricala explained that he felt that it was necessary to take the conversation outside of the residence due to Clifford's presence in the home.  Doc. #136, Ex. G, ¶23.  Kelly argues that "[the] situation could have been easily handled by asking [him] to put [Clifford] in the back yard."  Doc. #146, 6:8-18.

cause for an arrest.  Accordingly, summary judgment is granted in favor of Catricala on Kelly's second claim for unlawful arrest.

**C.    Third Cause of Action—Excessive Force in Violation of 42 U.S.C. § 1983 (Catricala and Campbell)**

Excessive force claims are analyzed under the "objective reasonableness" standard of the Fourth Amendment.  *See Graham v. Connor*, 490 U.S. 386, 388 (1989); *see also Tennessee v. Garner*, 471 U.S. 1, 2 (1985); *see also Robinson v. Solano Cnty.*, 278 F.3d 1007, 1013-14 (9th Cir. 2002).  The inquiry is a fact-intensive balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003).  Courts evaluate "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Robinson*, 278 F.3d at 1014 (citing *Graham*, 490 U.S. at 396).  The Ninth Circuit considers whether the suspect poses an immediate threat to the safety of the officers or others to be the "most important" *Graham* factor.  *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005).  The Ninth Circuit also considers the total "quantum of force" involved, the availability of alternative methods of detaining the suspect, and the arrestee's mental and emotional state.  *Luchtel v. Hagemann*, 623 F.3d 975, 980 (9th Cir. 2010); *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994) (the *Graham* factors, "and other factors bearing on . . . reasonableness . . . are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure").  Moreover, "[t]hese factors . . . are not exclusive.  Rather, [courts] examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case[.]"  *Mattos*, 661 F.3d at 441 (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)) (internal quotation marks omitted).  Finally, courts conduct their evaluation of reasonableness "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396) (internal quotation marks omitted).  Because the assessment of objective reasonableness in excessive force

12

1  cases is highly fact-specific, summary judgment should be granted sparingly.  *See Boyd v. Benton*

2  *Cnty.*, 374 F.3d 773, 778-79 (9th Cir. 2004); *see also LaLonde v. Cnty. of Riverside*, 204 F.3d 947,

3  960 (9th Cir. 2000).

4              **1.      Quantum of Force**

5          Here, the parties agree that Catricala and Campbell used a "double-arm bar" technique to

6  effectuate Kelly's arrest.[15]  Catricala testified that he and Campbell took Kelly to the ground softly

7  in a slow and controlled maneuver.  Doc. #136, Ex. G, ¶27.  Kelly, on the other hand, asserts that

8  he was "forcibly slammed down," in a manner that caused injury to his left shoulder and knee.[16]

9  Doc. #145, Ex. 17, 4:26.

10         Contrary to Defendants' assertion that the severity of Kelly's injury is not relevant to the

11  reasonableness inquiry, the Court finds that the severity of Kelly's injury relates to the assessment

12  of the quantum of forced used to arrest him.  *See Wilkins v. Gaddy*, 559 U.S. 34, 37-38 (2010)

13  (finding the extent of injury suffered may be relevant in determining whether force was necessary

14  in a particular situation).  Defendants further contend that the appropriateness and reasonableness

15  of Catricala and Campbell's use of force "is well demonstrated by the fact that [Kelly] did not

16

17         [15]   Kelly testified that Catricala and Campbell "put [him] in a double arm bar," which he
18  believes, in conjunction with the manner in which he was handcuffed, caused the injury to his shoulder.
    Doc. #136, Ex. A, 85:10-12.  Defendants submit that the "armbar" technique is "taught to law
19  enforcement to subdue agitated, non-compliant and/or combative suspects.  It is a series of moves
    designed to control and bring a suspect down to the ground with the least amount of force and injury
20  to the suspect.  In using this technique, an Officer grabs the suspect's wrist and brings his palm down
    toward the Officer's thigh as closely as possible which requires a twisting motion.  While bring[ing]
21  the suspect's arm down, the Officer brings up his forearm in a bent position and places it against the
    backside of the suspect's arm.  The Officer then pushes his forearm to push the suspect's elbow into
22  a straight and locked position.  The suspect then moves in a downward position.  The Officer then
    increases force with a downward push and steps back to take the suspect down to the ground."  Doc.
23  #137, pp. 14-15 n.8.

24         [16]   There appears to be no dispute regarding Kelly's complaint that his handcuffs were too tight
25  or the fact that they were adjusted thereafter.  Doc. #136, Ex. G, ¶33; Doc. #136, Ex. H, ¶28; Doc.
    #136, Ex. I, ¶31.  Nevertheless, Kelly claims that the manner in which the handcuffs were applied
26  aggravated his injury.  Doc. #136, Ex. C, 8:21-22.

receive any medical treatment, whatsoever, for injuries allegedly received from [the double-arm bar] maneuver for approximately three (3) years." Doc. #137, pp. 15-16 n. 9. Kelly admits that he did not receive medical attention for his injuries for almost three years.[17] Doc. #136, Ex. A, 101:21-24. Nevertheless, he contends that he was unable to obtain the MRI necessary to diagnose his injuries because he was not insured at the time. Doc. #136, Ex. A, 101:25-102-5. Ultimately, in 2013, Kelly was diagnosed with a left quadricep rupture and a left rotator cuff tear, requiring surgical intervention. Doc. #145, Ex. 24.

Kelly further contends that the extent of his injuries were immediately apparent as he required assistance getting off the floor of his home, lifting his left arm, and getting into and out of Hunn's patrol car after the arrest due to the injuries he sustained on his left side. Doc. #136, Ex. C, 8:23-26, 9:16-20; Doc. #145, Ex. 17, 5:15-22. Kelly admits that he did not directly accuse any of the Defendants of injuring him at the scene. Doc. #145, p. 8. However, Kelly claims to have immediately reported his injuries to a corrections officer upon arrival to CCDC. Doc. #136, Ex. A, 97:22-98:5; Doc. #136, Ex. C, 10:3-6; Doc. #145, Ex. 17, 34:17-34. Kelly also admits that he did not receive treatment for any injuries at CCDC, but he claims to have explained his injuries to a nurse. Doc. #136, Ex. A, 99:4; Doc. #145, Ex. 17, 34. Officer Hunn also confirmed in his Officer's Report that he overheard Kelly tell the nurse that "[t]he cops beat me up and dislocated my shoulder." Doc. #145, Ex. 20, p. 2. In response to his request for documentation of his injuries and a diagnosis, Kelly admits that an unidentified NaphCare nurse offered him an x-ray if he stayed overnight.[18] Doc. #136, Ex. A., 99:9-17. Kelly declined the offer and opted to be released because he "didn't believe than an x-ray was going to diagnose anything" related to what he believed was ligament or tendon damage. Doc. #136, Ex. A, 99:19-23. Finally, it is undisputed that Kelly filed a

_____

[17] Kelly claims that the first time he received diagnosis for his injuries was in 2013 by Dr. Quesada at Black Mountain Orthopedics and Las Vegas Radiology. Doc. #136, Ex. A, 104:5-21; Doc. #136, Ex. C, 11:17-21.

[18] It is undisputed that CCDC does not offer MRIs. Doc. #136, Ex. A, 99:17-18.

1  complaint regarding his injuries with Las Vegas Risk Management on December 6, 2010, one day

2  after the incident in question.  Doc. #145, Ex. 21, Doc. #136, Ex. A, 102:6-10.

3       Defendants' testimony regarding the incident is divergent in several respects.  While

4  Catricala testified that he and Campbell did indeed assist Kelly off of the ground, Catricala and

5  Campbell also testified that Kelly then walked to the patrol car on his own.  Doc. #136, Ex. G,

6  ¶¶29, 30; Doc. #136, Ex. I, ¶29.  Catricala testified that, at that time, Kelly told them that he had

7  previously injured his knee.  Doc. #136, Ex. G, ¶29.  Campbell also stated that Kelly said he had

8  had surgery on his knee.  Doc. #145, Ex. 16, 11:33.  Similarly, Hunn noted in his Officer's Report

9  that Kelly told him that he had several pre-existing medical conditions and would require assistance

10 getting out of the patrol car.  Doc. #145, Ex. 20, p. 1.  Specifically, Hunn claims that Kelly stated

11 that he had a bad knee, a bad shoulder, and a swollen ankle.  Doc. #145, Ex. 20, p. 1.  Defendants

12 also testified that they never heard Kelly complain of any injuries to any of the officers on the

13 scene.  Doc. #136, Ex. G, ¶34; Doc. #136, Ex. H, ¶30; Doc. #136, Ex. I, ¶32.  According to

14 Catricala, he asked Kelly if he needed medical attention and Kelly declined.  Doc. #136, Ex. G,

15 ¶33.  Campbell also stated that Kelly was asked several times if he wanted an ambulance or if he

16 required one for his knee, but Kelly declined.  Doc. #145, Ex. 16, 11:36-37.  Hunn also noted in

17 this Officer's Report that during his interactions with Kelly, both at the scene and en route to

18 CCDC, Kelly made no complaint of injury.  Doc. #145, Ex. 20, pp. 1-2.

19              **2.       Severity of the Crime at Issue**

20       Here, the crime at issue, violation of NRS 197.190, is a misdemeanor.  Although,

21 Defendants were dispatched to Kelly's residence to investigate a domestic disturbance, that was not

22 the basis on which Kelly was arrested.

23              **3.       Immediate Threat Posed to Officers or Others**

24       The threat posed is the most significant Graham factor.  *See Chew v. Gates*, 27 F.3d 1432,

25 1441 (9th Cir. 1994).  Here, the parties do not dispute that Alexander's safety was not at issue as

26 she was no longer inside the residence with Kelly.  However, Catricala and Campbell assert that the

situation at Kelly's residence had escalated to a point where they feared for their safety.  Doc. #137, 14:11-19.  Specifically, Catricala and Campbell cite the following circumstances as giving rise to their perception of an immediate threat: (1) Kelly's refusal to show his hands or otherwise comply with Defendants' orders; (2) Kelly's concealment of part of his body behind the door; (3) the presence of Kelly's dog, which they perceived as aggressive and threatening; (4) their knowledge of the fact that Kelly had a gun inside his residence; and (5) Kelly's signal that he was going to retreat into his residence.  Doc. #137, 14:12-19.  Catricala testified that because Kelly had one hand in his pocket and refused to come outside, he did not know whether Kelly had a weapon on him, which raised a huge safety concern.  Doc. #136, Ex. G, ¶¶24, 25.  Catricala also testified that Kelly was intoxicated and his demeanor was aggressive and uncooperative.  Doc. #136, Ex. G, ¶25. Defendants were also informed that Kelly was a bounty hunter.  Doc. #145, Ex. 3.  Finally, Catricala testified that Kelly's retreat into his residence was a further threat to Defendants safety, at which point he finally decided to arrest Kelly.  Doc. #136, Ex. G, ¶26.

On the other hand, Kelly asserts that he could not show both of his hands at once because he was holding Clifford with his other hand.  Doc. #136, Ex. C, 7:7-15.  He challenges Catricala and Campbell's assertion that he was concealing part of his body behind the door, instead asserting that he was facing Defendants when Catricala and Campbell took him down.  Doc. #145, pp. 9-10.  He also challenges Catricala and Campbell's assertion that he was retreating back into the residence. Doc. #145, pp. 9-10.  Moreover, Kelly denies that he was intoxicated at the time.[19]  Doc. #136, Ex. C, 17:7-8.  Finally, while Kelly claims that his dog did not actually present a threat to Defendants, the Court's reasonableness inquiry is limited only to what Defendants perceived at the time.  As such, the Court shall not consider facts, even if true, that were unknown to Defendants at the time in question.

///

[19]  In a statement to Internal Affairs, Kelly conceded that he had been drinking that evening. Doc. #145, Ex. 17, 7:34-36.

### 4.      Resistance or Attempts to Evade Arrest

Defendants contend that because Kelly refused orders to come outside and show both of his hands, "it stands to reason that [he] was not going to stand still and voluntarily allow himself to be handcuffed by [Defendants]." Doc. #137, 16:11-14.  However, Defendants argument in this regard is far cry from putting forth any evidence that Kelly was in fact resisting arrest or attempting to evade arrest.  Nevertheless, the parties dispute whether Kelly began to retreat back into his residence just prior to his arrest.  Catricala testified that Kelly's retreat signaled a further threat to Defendants' safety.  Doc. #136, Ex. G, ¶26.  Campbell also testified that Kelly turned to retreat into his residence just before Catricala grabbed one of his arms.  Doc. #136, Ex. I, ¶¶22, 23.  Finally, Garcia testified that Catricala and Campbell grabbed Kelly in order to stop him from going back into the residence.  Doc. #136, Ex. H, ¶24.  Nevertheless, it is not clear that any indication Kelly may have given that he was "retreating" back into his residence was an attempt to evade arrest. Moreover, Kelly denies that he was retreating into his residence, and asserts that he was facing Defendants when they arrested him.  Doc. #145, pp. 9-10.

### 5.      Totality of the Circumstances

"For the purposes of summary judgment, even in a qualified immunity case, [courts] must assume the nonmoving party's version of the facts to be correct.  *Liston v. Cnty. of Riverside*, 120 F.3d 965, 977 (9th Cir. 1997) (citing *Alexander v. City and Cnty. of San Francisco*, 29 F.3d 1355, 1322 (9th Cir. 1994)).  A court may decide reasonableness as a matter of law if, "in resolving all factual disputes in favor of the plaintiff, the officer's force was objectively reasonable under the circumstances."  *Jackson v. City of Bremerton*, 268 F.3d 646, 651 n.1 (9th Cir. 2001) (internal quotation omitted).  Here, the Court finds that, accepting the facts set forth by Kelly as true, Catricala and Campbell are not entitled to summary judgment as a matter of law.  Recognizing that the moments immediately following Defendants' arrival on scene were potentially dangerous and undeniably tense, the Court is, nevertheless, unable to conclude as a matter of law that the force used upon Kelly was reasonable, or that reasonable officers would have concluded that their acts

comported with the Fourth Amendment.  Genuine issues of fact remain regarding whether Catricala

and Campbell used excessive force against Kelly and whether reasonable officers would have

concluded that the force employed was reasonable under the circumstances.  Accordingly, summary

judgment as to Kelly's third cause of action for excessive force is denied.

### D.  Seventh Cause of Action—Municipal Liability (LVMPD)

Here, Kelly alleges that LVMPD's failure to adequately train, supervise, or discipline its

officers created a *de facto* policy, custom, or practice of LVMPD officers engaging in

unconstitutional actions and using unreasonable force.  Doc. #67, ¶137.  Kelly further alleges that it

was this *de facto* policy, custom, or practice that was the moving force behind the alleged illegal

and unconstitutional actions in the present case.[20]  *Id.*, ¶138.

A municipal entity may be liable under § 1983 "only where the municipality itself causes

the constitutional violation through execution of a government's policy or custom, whether made

by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."

*Ulrich v. City & Cnty. of S.F.*, 308 F.3d 968, 984 (9th Cir. 2002) (quotation omitted).  "Liability for

improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon

practices of sufficient duration, frequency and consistency that the conduct has become a traditional

method of carrying out policy."  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).  A plaintiff

may base his or her municipal liability on three theories: commission, omission, ratification.  *See*

*Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249-50 (9th Cir. 2010).  A plaintiff seeking to

establish liability for a municipality's omissions must show that the municipality's "deliberate

indifference led to its omission and that the omission caused [a municipal] employee to commit the

---

[20]  Because the Court finds that summary judgment in favor of Defendants is appropriate on
Kelly's claims for unlawful entry and unlawful arrest, the only basis on which Kelly may proceed is
excessive force.  *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (municipal liability under
§ 1983 requires a showing that there is a direct causal link between a municipal policy or custom and
the alleged constitutional deprivation); *see also City of Los Angeles v. Heller*, 475 U.S. 796, 810-11
(1986) (there can be no *Monell* liability absent a constitutional violation).

constitutional violation." *Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1186 (9th Cir. 2002). To establish liability through omission, a plaintiff must show: (1) that the plaintiff's rights were violated; (2) that the municipality has customs or policies that amount to deliberate indifference; and (3) that these policies were the "moving force" behind the employee's violation of the plaintiff's constitutional rights. *Id.* at 1194. "To prove deliberate indifference, the plaintiff must show that the municipality was on actual or constructive notice that its omission would likely result in a constitutional violation." *Id.* at 1186. Finally, a policy, or lack thereof, is the "moving force" if the municipality "could have prevented the violation with an appropriate policy." *Id.* at 1194.

Here, Kelly has failed to present any evidence raising a genuine issue of material fact that LVMPD failed to train, supervise, or discipline its officers, such that a policy or custom of using excessive force developed. Instead, Kelly relies primarily on a Report, titled "A Review of Officer-Involved Shootings in the Las Vegas Metropolitan Police Department," which was issued by the United States Department of Justice, Community Oriented Policing Services in October 2012 (the "COPS Report"). Doc. #145, Ex. 25; Doc. #153, Ex. B.[21] The Court perceives two problems with Kelly's reliance on the COPS Report. First, the COPS Report is not relevant to the present dispute, as its focus is on the use of *deadly* force and officer related shootings. Specifically, the COPS Report "centered on LVMPD deadly force issue areas." Doc. #153, Ex. B, p. 7. To the extent the COPS Report makes findings and recommendations related to LVMPD's use of force policies and training, those findings and recommendations are based on a review of data pertaining to officer involved shootings. Quite simply, this is not a case related to the use of deadly force or an officer involved shooting. Accordingly, the Court finds that the COPS Report is not relevant or admissible to show that LVMPD had a policy or custom of using non-deadly excessive force.

Second, even if the COPS Report is relevant, the Court nevertheless finds that it is inadmissible pursuant to Federal Rule of Evidence ("FRE") 407, which makes subsequent remedial

---

[21] As Kelly omitted a number of pages from the COPS Report in his submission, LVMPD subsequently included a true and correct copy of the Report in its entirety.

measures inadmissible to prove culpable conduct. The COPS Report has a stated goal of reducing the number of shootings, reducing the number of persons killed as a result of officer involved shootings, transforming LVMPD's organization and culture as it relates to deadly force, and enhancing officer safety. Doc. #153, Ex. B, p. 7. Accordingly, the entire review, reform, and recommendation process was an effort on the part of LVMPD to improve its use of force policies and other areas related to officer involved shootings. Here, Kelly is attempting to introduce the COPS Report as evidence of culpable conduct (i.e., that LVMPD had a policy or custom of using excessive force at the time of the incident in question, December 5, 2010). Kelly even argues that "[i]f this problem was not widespread within LVMPD, there wouldn't have been a need for the [review and subsequent Report]." Doc. #145, 12:21-25. Kelly further argues, that "LVMPD was clearly aware that their training, supervision, and discipline of [o]fficers had been failing the community for years. Were this not the case, [he] would simply have gone about business as usual." Id. at 18:20-27. As such, the Court finds that the COPS Report is inadmissible.[22]

    Although Kelly identifies several witnesses, all of whom he claims would testify as to other incidents of excessive force by the LVMPD, this is not evidence sufficient to defeat summary judgment. *See Clouthier*, 591 F.3d at 1252 ("[c]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment") (quoting *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007)). Moreover, the testimony that these witnesses would supposedly proffer is irrelevant, and thus inadmissible, and entirely insufficient to raise a genuine issue of fact as to other incidents of excessive force. Specifically, the complaint against LVMPD and the settlement agreements between LVMPD and former claimants to which Kelly refers are as speculative as they are irrelevant—there is no

---

[22] Kelly argues that FRE 407 does not preclude admissibility of the COPS Report because it "would not have made [his] injuries any less likely to occur." Doc. #145, 12:11-15. However, Kelly cannot have it both ways. The COPS Report is only relevant, and thus admissible, if it relates to the LVMPD's use of force policy under similar circumstances. If the COPS Report is relevant, it certainly would have made his injuries less likely to occur.

indication that either would demonstrate a policy or custom of police misconduct.  Additionally, Kelly's reference to Internal Affairs Lieutenant James Mizusaki "who can testify that from 2011-2012, out of the more than 400 excessive force claims, only 7 were found to have any merit," even if accepted, simply does not evidence a policy or custom of excessive force or deliberate indifference.  There is no indication that the determination as to merit was flawed or otherwise improper.

Moreover, the cases to which Kelly cites are entirely inapposite.  *Scott v. LVMPD*, No. 2:10-cv-01900-ECR-PAL, 2011 WL 2295178 (D. Nev. June 8, 2011) and *Gibson v. LVMPD*, No. 2:12-cv-00900, 2013 WL 876291 (D. Nev. Mar. 7, 2013) were both at the motion to dismiss stage and, thus, have no applicability here.  Moreover, in *Perez-Morciglio v. LVMPD*, 820 F. Supp. 2d 1111, 1130 (D. Nev. 2011), the plaintiff proffered testimony that it was the casino's standard operating procedure to put LVMPD handcuffs on any person handcuffed by casino personnel.  The plaintiff also presented evidence that the LVMPD officer defendants had never questioned a casino security guard's decision to detain an individual.  *Id.*  Accordingly, the court found that "[a] reasonable jury could infer this policy, custom, or practice [would] likely to lead to Fourth Amendment violations . . . [and that] LVMPD knew or should have known that abdicating to casino security guards its responsibility to make independent evaluations regarding the appropriateness of using handcuffs or detaining individuals likely would result in constitutional violations."  *Id.*  In contrast here, Kelly has produced no such evidence indicating a policy, custom, or practice that LVMPD knew or should have known about.  Finally, Kelly fails to proffer any evidence of a causal connection between the LVMPD's alleged policy or custom of using excessive force and the incident in question.  Accordingly, summary judgment is granted in favor of LVMPD on Kelly's seventh claim for municipal liability.

**E.     Eight Cause of Action—Assault and Battery (Catricala and Campbell)**

NRS 41.032 sets forth exceptions to Nevada's general waiver of sovereign immunity and provides that no action may be brought against a state officer or employee or any state agency or

1    political subdivision that is:

2        [b]ased upon the exercise or performance or the failure to exercise or perform a
         *discretionary function* or duty on the part of the State or any of its agencies or
3        political subdivisions or of any officer, employee or immune contractor of any of
         these, whether or not the discretion involved is abused.

4

5    NRS 41.032(2) (emphasis added).[23]  In Nevada, a decision is entitled to discretionary immunity

6    under NRS 41 .032 if the decision "(1) involve[s] an element of individual judgment or choice and

7    (2) [is] based on considerations of social, economic, or political policy." *Martinez v. Maruszczak*,

8    123 Nev. 433, 168 P.3d 720, 728-29 (2007) (adopting the United States Supreme Court's

9    *Berkovitz-Gaubert* two-part test regarding discretionary immunity under the Federal Tort Claims

10   Act).  "In applying this test, [courts] assess cases on their facts, keeping in mind Congress' purpose

11   to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social,

12   economic, and political policy through the medium of an action in tort." *Gonzalez v. LVMPD*, No.

13   61120, 2013 WL 7158415, at *2 (Nev. Nov. 21, 2013) (citing *Martinez*, 168 P.3d at 729) (internal

14   quotation marks and citations omitted).

15          Here, the acts that form the basis for Kelly's assault and battery claims stem from

16   Catricala's decision to arrest Kelly for obstruction, as well as Catricala and Campbell's decision

17   regarding how much force was necessary to accomplish the arrest.  "[Police o]fficers' decisions 'as

18   to how to accomplish a particular seizure or search [are] generally considered . . . discretionary

19   determination[s] under Nevada law, and officers are therefore immune from suit as to state law

20   claims arising therefrom in most cases." *Sandoval v. LVMPD*, No. 12-15654, 2014 WL 2936254,

21   at *10 (quoting *Davis v. City of Las Vegas*, 478 F.3d 1048, 1059 (9th Cir. 2007)); *see also Hart v.*

22   *United States*, 630 F.3d 1085, 1090 (8th Cir. 2011) (concluding that "a federal law enforcement

23

24   _____

25       [23]   On its face, this statute does not appear to immunize municipal governments or their
     employees.  Nevertheless, the Nevada Supreme Court has implicitly assumed, without directly
26   addressing the question, that municipalities are political subdivisions of the state for the purposes of
     the discretionary immunity statute.  *See, e.g.*, *Travelers Hotel, Ltd. v. City of Reno*, 741 P.2d 1353,
     1354-55 (Nev. 1987).

officer's on-the-spot decisions concerning how to effectuate an arrest—including how best to restrain, supervise, control or trust an arrestee—fall within the discretionary function exception to the [Federal Tort Claims Act] absent a specific mandatory directive to the contrary").  As such, the Court finds that Catricala and Campbell meet the first prong of the *Berkovitz-Gaubert* test because the decision to arrest Kelly, as well as the decision as to how much force was necessary to accomplish the arrest, required personal deliberation and judgment.[24]

As to the second prong of the *Berkovitz-Gaubert* test, immunity attaches "if the injury-producing conduct is an integral part of governmental policy-making or planning, if the imposition of liability might jeopardize the quality of the governmental process, or if the legislative or executive branch's power or responsibility would be usurped."  *Gonzalez*, 2013 WL 7158415, at *2 (quoting *Martinez*, 168 P.3d at 729).  "The district court does not determine a police officer's 'subjective intent in exercising the discretion conferred by statute or regulation, but [rather focuses] on the nature of the actions taken and on whether they are susceptible to policy analysis.'"  *Id.* (quoting *Martinez*, 168 P.3d at 728).  In this regard, the Court concludes that Catricala's decision to arrest Kelly for obstruction was based on policy considerations that required analysis of multiple concerns, not least of which was public safety.  *See id.*, at *3 (finding that the LVMPD's decision to arrest or detain suspect based on warrant was part of a public safety policy consideration). Moreover, Catricala and Campbell's determination as to how much force was necessary to effectuate the arrest involved similar considerations of LVMPD's use of force policy and training, as well as officer and public safety.  Accordingly, the Court finds that Catricala's decision to arrest Kelly, as well as Catricala and Campbell's decision as to the necessary force to effectuate Kelly's arrest meet the second prong of the *Berkovitz-Gaubert* test.  *See Spear v. City of N. Las Vegas*, No.

---

[24]  Kelly does not contend or present any evidence that Catricala or Campbell's actions were attributable to bad faith.  "'[W]here an officer's actions are attributable to bad faith, immunity does not apply whether an act is discretionary or not.'"  *Sandoval*, 2014 WL 2936254, at *19 (quoting *Davis*, 478 F.3d at 1059) (internal quotation marks and citations omitted); *see also Falline v. GNLV Corp.*, 107 Nev. 1004, 823 P.2d 888, 892 n.3 (1991)).

2:06-cv-00264-KJD-LRL, 2010 WL 3895761, at *9 (D. Nev. 2010) ("The [officers] are also protected under Nev. Rev. Stat. § 41.032 from the state law torts, because their handling of the situation with [the plaintiff] led to discretionary decisions that were concerning the scope and manner in which North Las Vegas Police Department conducts an investigation, or responds to an emergency call based on the policies of North Las Vegas Police, and did not violate a mandatory directive.") (internal quotation marks and citations omitted).  Accordingly, Catricala and Campbell are entitled to discretionary immunity on Kelly's eighth cause of action for assault and battery.

F.     Ninth Cause of Action—Negligence (LVMPD)[25]

Nevada looks to federal decisional law on the Federal Tort Claims Act for guidance on what type of conduct discretionary immunity protects. *Martinez*, 168 P.3d at 727-28.  The Ninth Circuit and other circuits have held that "decisions relating to the hiring, training, and supervision of employees usually involve policy judgments of the type Congress intended the discretionary function exception to shield." *Vickers v. United States*, 228 F.3d 944, 950 (9th Cir. 2000) (gathering cases).  Accordingly, the Court finds that LVMPD is entitled to discretionary immunity on Kelly's ninth cause of action.

IV.    **Motion to File Sur-Reply**

Local Rule 7-2(a)(c) provides for a motion, a response, and a reply.  No such provision exists for filing a sur-reply.  Thus, a party must obtain leave from the Court before filing a sur-reply.  Sur-replies "are highly disfavored, as they usually are a strategic effort by the nonmovant to have the last word on a matter." *Avery v. Barsky*, 3:12-CV-00652-MMD, 2013 WL 1663612, at *2 (D. Nev. Apr. 17, 2013) (quoting *Lacher v. W.*, 147 F. Supp. 2d 538, 539 (N.D. Tex. 2001)).  On the other hand, it is improper for a party to raise a new argument in a reply brief because the opposing party is not afforded an opportunity to respond. *See Salem Vegas, L.P. v. Guanci*, No.

---

[25]  The Court dismissed the individually named Defendants in Kelly's Ninth Cause of Action in its December 27, 2013 Order.  Doc. #124.  Accordingly, the LVMPD is the only remaining Defendant in Kelly's Ninth Cause of Action.

2:12-CV-01892-GMN, 2013 WL 5493126, at *3 (D. Nev. Sept. 30, 2013); *see also Castarphen v. Milsner*, 594 F. Supp. 2d 1201, 1204 n.1 (D. Nev. 2009).  Where the moving party presents new matters for the first time in a reply brief, the Court may either refuse to consider the new matters or allow the opposing party an opportunity to respond.  *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) (citing *Koerner v. Grigas*, 328 F.3d 1039, 1048 (9th Cir. 2003) ("[t]he district court need not consider arguments raised for the first time in a reply brief"); *see also Avery*, 2013 WL 1663612, at *2-3 (the non-movant may obtain leave to file a sur-reply to address new matters raised in the moving party's reply).  When permitted, a sur-reply may "*only [] address new matters raised in a reply to which a party would otherwise be unable to respond*."  *Kanvick v. City of Reno*, No. 3:06-CV-00058, 2008 WL 873085, at *1 n.1 (D. Nev. March 27, 2008) (emphasis in original).

Here, the Court finds that a sur-reply is not warranted.  Kelly asserts that "Defendants made a number of representations and arguments which [he] believes were knowingly false, misleading, or irrelevant," but concedes that "[t]he disproportionate majority of these false, irrelevant or misleading representations were made in [LVMPD's Motion for Summary Judgment]."  Doc. #158, ¶¶1, 2.  As such, Kelly had the opportunity to address them in his Response.  Moreover, Kelly's Response to Defendants' Motion for Summary Judgment was less than 10 pages in length.  *See* Doc. #146.  Accordingly, the Court rejects Kelly's assertion that "[Defendants'] misrepresentations were knowingly made to place a strain on [his] ability to address them all in the 30 page limit for his response."  Doc. #158, ¶3.  Kelly could have used the remaining 20 pages in his 30-page allotment to address these supposed misrepresentations, or he could have filed a motion for leave to file excess pages.  Finally, contrary to Kelly's averments, Defendants did not present new arguments or facts in their Reply such that a sur-reply would be necessary.  The statements to which Kelly refers relate to issues and arguments that Defendants raised in their Motion.  For all of the aforementioned reasons, Kelly's Motion for Leave to File Sur-Reply is denied.

IT IS THEREFORE ORDERED that LVMPD's Motion for Summary Judgment (Doc. #136) is GRANTED.  Judgment shall be entered in favor of LVMPD and against Kelly on Kelly's

Seventh and Ninth Causes of Action.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment (Doc. #137) is GRANTED in part and DENIED in part.  Judgment shall be entered in favor of Defendants Campbell, Catricala and Garcia, and against Kelly on Kelly's First, Second, and Eighth Causes of Action.  Only Kelly's Third Cause of Action for Excessive Force shall proceed.

IT IS FURTHER ORDERED that Kelly's Motion for Leave to File a Sur-Reply (Doc. #158) is DENIED.

DATED this 25th day of July, 2014.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE